**Pedro A. RAMOS, M.D., Plaintiff,**

v.

**BIOMET, INC., Defendant.**

**No. 90–0417–CIV.**

United States District Court, S.D. Florida.

Aug. 2, 1993.

---

R.W. Payne, Jr., A. Francisco Areces, Miami, FL, for plaintiff.

Donald E. Knebel, Indianapolis, IN, Bobby B. Gillenwater, Fort Wayne, IN, John T. Kolinski, Miami, FL, for defendant.

## MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARONOVITZ, District Judge.

THIS CAUSE was tried before the Court without a jury for a two week period commencing on April 12, 1993 and concluding on April 26, 1993. The Court has carefully considered all of the testimony and exhibits offered by the parties at trial, the entire record herein, the proposed findings and conclusions, and all memoranda of law submitted by the parties. Having done so, and being otherwise fully advised in the premises, the Court herewith renders this opinion containing Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Nature of the Case

This is an action for alleged patent infringement. Pedro A. Ramos, M.D. ("Dr. Ramos") alleges that Biomet, Inc. ("Biomet") has willfully infringed claims 1 and 3 of United States Patent No. 4,380,090 (the " '090 patent") through the manufacture and sale of its BiPolar hip prosthesis. Biomet denies the material allegations of Ramos' complaint, denies that its invention infringes claims 1 or 3 of the '090 patent, and asserts as affirmative defenses that Ramos' claims are barred by the equitable doctrines of laches and estoppel, that the BiPolar hip prosthesis does not infringe the claims of the '090 patent either literally or under the doctrine of equivalents, that the '090 patent is invalid under 35 U.S.C. §§ 102, 103, and/or 112, and that Ramos' claims are barred by the doctrine of prosecution history estoppel.

Dr. Ramos has claimed, and proven by the evidence, that the Defendant, Biomet, infringed literally and through the doctrine of equivalents his duly patented unique hip prosthesis device. As later found herein, total damages are awarded to Dr. Ramos in the aggregate sum of $5,814,478.08. Plaintiff claims that the patented Ramos invention is the first hip prosthesis having an hemispherically fully split bearing insert with an annular outer section removably locked into an acetabular cup.

Prior to trial the parties stipulated and agreed that the allegations of breach of confidences and fraudulent concealment contained in Ramos' Complaint are withdrawn. The parties further stipulated and agreed that the request for attorney's fees contained in Ramos' Complaint is withdrawn.

This Court has federal jurisdiction for this patent infringement action pursuant to 28 U.S.C. § 1338(a), in that this action arises under an Act of Congress relating to patents; namely, 35 U.S.C. § 271, *et seq.* Venue is appropriate pursuant to 28 U.S.C. § 1400.

### Findings of Fact

1. Plaintiff Dr. Ramos is a licensed, practicing physician and surgeon in Dade County, Florida specializing in the practice of orthopaedic surgery.

2. The Defendant, Biomet, Inc., is an Indiana corporation formed in the late 1970's. Biomet is a manufacturer of orthopaedic implants, including hip prostheses.

3. Dr. Ramos is the inventor and owner of U.S. Patent 4,380,090, and has always owned that patent and the applications from which it issued. (Plaintiff's Exhibit No. 5).

4. Ramos U.S. Patent 4,380,090 was issued by the U.S. Patent and Trademark Office ("PTO") on April 19, 1983. (Plaintiff's Exhibit No. 5).

5. On or about March 23, 1983, Dr. Ramos met with Niles Noblitt, Biomet's then Vice President of Technical Affairs (now, Chairman of the Board and Chief Executive Officer), in Miami, Florida. At this meeting, Dr. Ramos disclosed his now patented design and his allowed patent application to Defendant Biomet. The parties discussed Biomet's interest in marketing such an invention. (*See* Defendant's Exhibit No. 4).

6. At the time Dr. Ramos disclosed his patented invention to Biomet on March 23, 1983, Biomet was not even working on any proposed design for a bipolar hip prosthesis. (*See* Plaintiff's Exhibit 1).

7. Prior to the time that Dr. Ramos disclosed his invention to Biomet on March 23, 1983, he requested an assurance that Biomet was not working on any proposed design for a bipolar hip prosthesis. (Plaintiff's Exhibit 1; Ramos Testimony, 4/13/93, p. 69; Noblitt Testimony, 4/20/93, p. 84).

8. Prior to the time that Biomet entered into the Confidentiality Agreement with Dr. Ramos relating to his invention, Biomet represented to Dr. Ramos that at that time it had no such device, or any device containing any similar working parts, currently in manufacture, or the subject of research and/or development, and warranted and represented to Dr. Ramos that no such device was then under research and/or development and/or manufacture or production by Biomet.

(Plaintiff's Exhibit 1; Ramos Testimony, 4/13/93, pp. 69–70; Noblitt Testimony, 4/20/93, p. 84).

9. After meeting with Dr. Ramos on March 23, 1983, and reviewing his drawings, patent application and specifications thereof relating to his invention, on March 29, 1983, Biomet, through Niles Noblitt, demonstrated an interest in Dr. Ramos' invention for development. (Plaintiff's Exhibit 11; Ramos Testimony, 4/13/93, pp. 71–72; Noblitt Testimony, 4/20/93, pp. 77–80).

10. On May 6, 1983, Biomet again represented to Dr. Ramos that it continued to be interested in Dr. Ramos' bipolar cup design invention, and requested to be provided with a file history and a copy of all prior art references with which Dr. Ramos was familiar. (Plaintiff's Exhibit 12; Ramos Testimony, 4/13/93, pp. 72–73; Noblitt Testimony, 4/20/93, p. 78).

11. On May 19, 1983, Dr. Ramos forwarded to Biomet copies of all references that he went through when researching was done while prosecuting his patent application. (Plaintiff's Exhibit 12A; Ramos Testimony, 4/13/93, pp. 73–74; Noblitt Testimony, 4/20/93, p. 79).

12. About May 19, 1983, Dr. Ramos also sent a copy of his issued '090 patent to Biomet, receipt of which was acknowledged by Biomet. *Id.*

13. The subject matter claimed in the Ramos '090 patent was disclosed in Dr. Ramos' second patent application, Serial No. 286,532, filed July 24, 1981, which application as of that date constituted a constructive reduction to practice of the claimed invention. (Defendant's Exhibit 3).

14. On June 7, 1983, Biomet acknowledged receipt of Dr. Ramos' May 19, 1983 letter and enclosures, as well as a copy of Ramos' U.S. patent, No. 4,380,090 and continued to be interested in Dr. Ramos' patented bipolar cup design invention and requested a copy of the complete file history relating to the prosecution of the Ramos '090 patent. (Plaintiff's Exhibit 13; Ramos Testimony, 4/13/93, pp. 75–76; Noblitt Testimony, 4/20/93, p. 79).

15. On July 12, 1983, Dr. Ramos responded to Biomet's June 7, 1983 request and forwarded to Biomet the requested information. (Plaintiff's Exhibit 14; Ramos Testimony, 4/13/93, pp. 75–76; Noblitt Testimony, 4/20/93, p. 79).

16. Biomet did not communicate with Dr. Ramos or his attorney after June 7, 1983.

17. Ramos originally had approached Biomet in March, 1983, in an effort to secure an agreement with a manufacturer with the capability of producing and marketing his unique hip prosthesis device. Ramos and Biomet met in Miami, Florida in March, 1983, and discussed, in exacting detail, the specifics of his design. During these discussions, Biomet representatives viewed drawings, were shown the Ramos patent application, and a prototype of a hip prosthesis device manufactured by another company. At that time, Ramos' patent application had already been allowed by the U.S. Patent and Trademark Office and that fact and the allowed patent claims were openly disclosed to Biomet. In May, 1983, Ramos provided Biomet with copies of the issued '090 patent. Biomet and Ramos had corresponded several times. But, after extensive and protracted study of the Ramos design by Biomet representatives, Defendant Biomet in July, 1983 ceased all communication with Dr. Ramos.

18. Before March, 1983, Biomet had worked on a proposed hip prosthesis product, but when Biomet showed a prototype of that proposed product to its distributors and hip surgeons, that proposed product was rejected by such distributors and surgeons, and thus Biomet failed to bring that proposed design to commercial manufacture and sale. After the unsuccessful attempt to enter the bipolar hip prosthesis market, Biomet made no other attempt to do so until after it had been shown Dr. Ramos' patented invention.

19. Biomet hired Tony Fleming in July, 1983. Mr. Fleming testified that by the end of July, 1983, he had designed Biomet's BiPolar hip prosthesis, having never designed a hip prosthesis before.

20. Defendant Biomet began commercially manufacturing and selling its BiPolar hip prosthesis, which Dr. Ramos alleges infringes his '090 patent, in the fall of 1983. Within six months after Dr. Ramos disclosed his invention to Biomet, Biomet had commenced manufacturing and selling the accused Biomet BiPolar hip prosthesis, which incorporates all of the elements and functions of Dr. Ramos' patented design. (Plaintiff's Exhibit 4; Plaintiff's Exhibit 5; Gibson Testimony, 4/16/93, pp. 7–20; Swanger Testimony, 4/19/93, pp. 48–49, 52–64).

21. Before commencing manufacture and sale of the accused Biomet BiPolar hip prosthesis, Biomet had not been manufacturing or selling any bipolar type hip prosthesis. (*See* Plaintiff's Exhibit 1).

### Background

22. This case relates to artificial hip implants. Such implants generally include a "femoral stem" affixed at the top of the femur or thigh bone which has the ball portion removed. The femoral stem includes a ball or "femoral head" at its uppermost portion designed to fit into the "acetabulum" or natural hip socket. A cup-shaped acetabular shell may be included to receive the artificial femoral head.

23. Hip prostheses may be categorized as either "total" or "partial." A total hip prosthesis includes an acetabular shell which is cemented or otherwise fixed against movement in the natural hip socket. Total hip prostheses may be of the "constrained" or "unconstrained" variety. Constrained total hips include a mechanism for locking the femoral head inside the bearing insert. Unconstrained total hips include no locking mechanism, relying instead upon muscle tissue and bodily forces to retain the femoral head in the bearing insert. (Ramos Testimony, 4/13/93, pp. 3–7).

24. Partial hip prostheses include "unipolar" and "bipolar" devices. A unipolar prosthesis includes a femoral ball that is large enough to fit into the acetabulum. Such devices do not include acetabular shell components. Bipolar prostheses include an acetabular shell which is free to rotate in the acetabulum independent of the rotation of the femoral head inside the acetabular shell.

25. After considerable effort, time expended, and personal study of hip prostheses

and the problem of the acetabular cup separating from its insert portion (necessitating another replacement procedure for the effected individual), Dr. Ramos conceived of the unique idea to fully, hemispherically split the bearing insert portion of a hip prosthesis and use an annular outer section of the bearing insert removably retained in an acetabular cup in operative engagement with the hemispherical inner section by an open circular locking ring.

26. Plaintiff claims that his invention may be installed with ease and is readily assembled or disassembled with great ease and without special tools, whether outside a patient or already installed in a patient. And, individual parts of the patented device may easily be replaced without the necessity of replacing the entire prosthetic hip joint. The patented device thus facilitates the surgical procedures, reduces duration of surgery, reduces costs of replacements, and promotes patient care. Dr. Ramos' patented device greatly improved the practicality of hip prostheses, thus improving the quality of life for persons who must undergo and live with hip replacement procedures.

### Infringement

27. Dr. Ramos claims that the BiPolar hip prosthesis manufactured by Biomet infringes claims 1 and 3 of the '090 patent. Claims 1 and 3 of the '090 patent are as follows:

(1) An artificial hip joint comprising an artificial hip socket having a first cavity and an opening in a surface of the socket communicating with the first cavity, an annular groove formed in the first cavity adjacent said opening, a sectionalized bearing insert registerably positioned in the first cavity inwardly of said groove, said bearing insert having a second cavity of spherical configuration greater in scope than hemispherical, a femoral component having a ball extending from a neck of reduced diameter, said neck extending through said socket opening positioning said ball in operative, retained engagement in said second cavity, said bearing insert having inner and outer sections, each section being formed with a complementary component of said second cavity, the cavity component of said inner section being approximately hemispherical, said outer section being annular in shape and having an outer surface portion opposite the cavity component thereof adapted to align with said annular groove when said outer section is in operative position in said first cavity, and an open annular spring locking ring having opposite ends formed with tool engaging openings, said locking ring being removably engaged in said annular groove in abutment with said outer surface portion of the bearing insert outer section, said locking ring, when in said groove engagement, being visibly exposed and removably retaining said annular outer section in said first cavity in operative engagement with the inner section whereby said ball is retained in said second cavity, said annular outer section being formed to expand over said ball when the later is removed from said first cavity.

(3) The artificial hip joint defined in claim 1 in which said annular outer section of the bearing insert is formed as a split ring for said expansion over the ball.

28. Plaintiff's Exhibit 4 is a representative sample of the Biomet BiPolar hip prosthesis, which Dr. Ramos alleges infringes the '090 patent.

29. Every element and function of Claim 1 of the '090 patent is present in the Biomet BiPolar hip prosthesis. In support of this factual finding, the Court accepts the credible testimony of Floyd A. Gibson, Esq., an experienced patent practitioner on Patent Office practice and patent claim construction.

30. All elements and functions, or equivalent elements, which perform substantially the same function in substantially the same way to the same result of Claim 1 of the '090 patent are present in the Biomet BiPolar hip prosthesis. (*See* Gibson Testimony, 4/16/93, pp. 7–20).

31. Every element and function of Claim 3 of the '090 patent is present in the Biomet BiPolar hip prosthesis. (*See Id.*).

32. All elements and functions, or equivalent elements, which perform substantially the same function in substantially the same way to give the same result of Claim 3 of

the '090 patent are present in the Biomet BiPolar hip prosthesis. (*See Id.*).

33. Contrary to Defendant Biomet's arguments, the accused Biomet BiPolar hip prosthesis clearly does have: a sectionalized bearing insert having both inner and outer sections; a second cavity of spherical configuration greater in scope than hemispherical; an annular outer bearing section; an outer portion of the outer bearing section to be aligned with an annular groove adjacent to the opening of a first cavity in an artificial hip socket; a locking ring ridge in integral abutment with that outer surface portion; that locking ring ridge retaining the annular outer section in the first cavity in operative engagement with an inner section and retaining a femoral ball therein. These are present in the Ramos invention. (*See Id.; see also* Swanger Testimony, 4/19/93, pp. 52–64).

34. The uncontroverted evidence in this case demonstrates that the infringing Biomet BiPolar hip prosthesis comprises an acetabular metal shell component, inner and outer sections of a bearing insert including a locking ring component, a femoral head/ball component, and a femoral stem component. (Plaintiff's Exhibit 4).

35. Virtually every one of Biomet's witnesses ultimately admitted that in the Biomet bipolar device the femoral component ball in some circumstances, after implantation into a human being, touches and moves vis-a-vis the outer bearing/locking ring section; i.e., that outer section thus functions as a bearing, contrary to Defendant's arguments. (Latta Testimony, 4/22/93, pp. 36–38; Pritchard Testimony, 4/21/93, pp. 49–50, 53–54, 58–59; Fleming Testimony, 4/22/93, pp. 176–178; England Testimony, 4/22/93, pp. 10–12; Noblitt Testimony, 4/20/93, pp. 118 and 123). The Plaintiff's witnesses agreed. (Ramos Testimony, 4/20/93, p. 136; Gibson Testimony, 4/16/93, pp. 10–12, 15, 102; Swanger Testimony, 4/19/93, pp. 53, 60, 63, 74 and 76).

36. Biomet's bipolar prosthesis needs its outer bearing/locking ring element to prevent possible dislocation of the femoral ball from the acetabular cap, and in such circumstances that element functions as the outer bearing section recited in the Ramos patent claims. (*See Id.*).

37. Biomet's witness, Dr. Latta, found and admitted that the retaining (locking) ring in each of the Ramos and Biomet devices operates by a "similar action." (Defendant's Exhibit 190, p. 2; Latta Testimony, 4/22/93, p. 36).

38. There is nothing in the Ramos '090 patent specification, drawings, or prosecution history which requires that the "spherical" configuration be limited to a single radius, or be a perfectly continuous cavity, nor must the claims be so construed. (Gibson Testimony, 4/22/93, p. 53–54; Swanger Testimony, 4/19/93, p. 82).

39. There is nothing in the Ramos '090 patent specification, drawings or prosecution history which requires that the locking ring and outer bearing section be physically separated from each other, nor must the claims be so construed. (Plaintiff's Exhibit 5; Gibson Testimony, 4/22/93, p. 57–59).

40. There is nothing in the Ramos '090 patent specifications, drawings or prosecution history which indicates that the outer bearing section and the locking ring portion of the claimed Ramos device could not be combined into a single piece without destroying their respective functions. (*See* Plaintiff's Exhibit 5; Defendant's Exhibit 190; Latta Testimony, 4/22/93, p. 36; Gibson Testimony, 4/16/93, pp. 15–16; Gibson Testimony, 4/22/93, pp. 54–55).

41. The Biomet BiPolar hip prosthesis is virtually identical to the device described and depicted in the Ramos '090 patent, except that Biomet has merged the forms and functions of Dr. Ramos' annular inner bearing and locking ring by molding them together in a single piece as if they were glued together. In this way, the accused Biomet BiPolar hip prosthesis is a virtual copy of Dr. Ramos' patented invention. (Plaintiff's Exhibit 4; Plaintiff's Exhibit 5).

42. Biomet's manufacture and sale of the Biomet BiPolar hip prosthesis literally infringes each of Claims 1 and 3 of the Ramos '090 patent.

43. Biomet's manufacture and sale of the Biomet BiPolar hip prosthesis infringes each

**1578**

of Claims 1 and 3 of the Ramos '090 patent via the doctrine of equivalents.

### Patent Validity

44. Biomet's counsel, on behalf of a third party, initiated reexamination of the Ramos '090 patent in June, 1992 by the Patent and Trademark Office.

45. The reexamination proceeding of the Ramos '090 patent shows that the U.S. Patent and Trademark Office ("PTO") Examiners considered all of the prior art cited therein by requestor not to be an adequate basis for final rejection of the claims of the '090 patent. (Plaintiff's Exhibit 5).

46. On April 21, 1993, the PTO Examiner issued a Notice of Intent to Issue Reexamination Certificate as to all claims of the '090 patent. That Notice of Intent confirmed the prior patent ('090) issued to Dr. Ramos. (Plaintiff's Exhibit 100).

47. The only prior art reference asserted in this action which was not considered by the PTO in the reexamination proceeding is the French patent, number 1.040,638, to May. No English translation of the written portion of this French patent was before the Court. There is no testimony as to how the various parts depicted in the drawings of the May patent function or interact. Biomet's engineer expert, Dr. Latta, could not positively state that the various elements of the May patent depicted in the drawings disclose the elements of the Ramos '090 patent so as to make the Ramos invention obvious to one skilled in the art. (Latta Testimony, 4/22/93, pp. 23–24).

48. The Court also heard testimony and examined the evidence with respect to the Judet patent, U.S. Patent No. 4,365,358; the Buechel patent, U.S. Patent No. 3,916,451; the Khovaylo patent, U.S. Patent No. 9,241,-463; the Giliberty patent, U.S. Patent No. 3,813,699; the Sherser patent, U.S. Patent No. 3,875,593; the Averill patent, U.S. Patent No. 3,863,273; the Noiles patent, U.S. Patent No. 3,848,272; the English patent, U.S. Patent No. 4,004,300 and the Scales patent, U.S. Patent No. 3,698,017. The Court does not find that obviousness is apparent or involved in any of the aforegoing.

### Conclusions of Law

#### Infringement

1. In patent/invalidity litigation the Court, as a matter of law, must construe the meaning of the patent claims. Claims must be construed the same way for determining infringement and any alleged invalidity thereof. *Smith Diagnostics, Inc. v. Helena Labs Corp.*, 859 F.2d 878, 882 (Fed.Cir. 1988). The initial determination must be to construe the lawful scope of the patent claims. Infringement determination is a two-step inquiry—determining the scope of the claims, and whether the claimed invention has been infringed. *McGill, Inc. v. John Zink Co.*, 736 F.2d 666, 671, 221 USPQ 944, 948 (Fed.Cir.1984), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984). In *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574, n. 2 (Fed.Cir.1985), the Federal Circuit said, "Claims are always interpretable in light of the specification and prosecution history of the application that lead to the patent."

2. The Court notes that a patentee may obtain a patent on a workable conception without having actually made a physical model of his invention. The filing of a patent application disclosing the workable conception constitutes a constructive reduction to practice of the invention. *Hazeltine Corp. v. United States*, 820 F.2d 1190, 2 USPQ2d 1744 (Fed.Cir.1987).

3. Under 35 U.S.C. § 271(a), infringement of a U.S. patent occurs when a person or entity, without authority of the patentee, makes, uses, or sells the patented invention within the United States. Infringement is determined by reading the claims of the patent on the accused infringing device. If the language of a claim literally reads upon the accused device, then the unauthorized maker, user, or seller of such device will be found by the Court to have infringed the patent in suit. The patentee has the burden of proving infringement by a preponderance of the evidence.

4. Even if the claim language possibly may not literally be read upon the accused device, the patentee may rely upon the "doctrine of equivalents" under which a de-

vice which "performs substantially the same function in substantially the same way to obtain the same result" may be held to infringe the patent claim. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). This is a tripartite test of "function, way and result":

> "The result of the doctrine is to make it impossible for the 'unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent, which, though adding nothing, would be enough to take the copied matter outside the claim.'"

*Radio Steel & Mfg. Co. v. MTD Products, Inc.*, 731 F.2d 840, 847, 221 USPQ 657, 663 (Fed.Cir.1984) (citing *Graver Tank*, 339 U.S. at 607, 70 S.Ct. at 855–56) *cert. denied,* 469 U.S. 831, 105 S.Ct. 119, 83 L.Ed.2d 62 (1984). It is well established that mere changes or even improvements in an invention patented by another if unlicensed may still be an infringement and the changer/improver may be sued for such infringement. *Temco Electric Motor Co. v. Apco Mfg. Co.*, 275 U.S. 319, 48 S.Ct. 170, 72 L.Ed. 298 (1928).

■ 5. Specifically, an apparatus patent claim describing a combination of components does not require that the function of each component be performed by a separate structure in the apparatus. The claimed and accused devices must be viewed and evaluated as a whole. Infringement is not avoided by making into one part that which has been shown as two. *Sun Studs, Inc. v. ATA Equipment Leasing, Inc.*, 872 F.2d 978, 989, 10 USPQ2d 1338 (Fed.Cir.1989) *reh'g declined,* 882 F.2d 1583 (Fed.Cir.1989); *McGrath v. Draper Corp.*, 384 F.2d 672, 673, 155 USPQ 609, 610 (1st Cir.1967); *Royal Typewriter Co. v. Remington Rand, Inc.*, 168 F.2d 691, 693, 77 USPQ 517, 519 (2d Cir. 1948); *Industrial Instrument Corp. v. The Foxboro Co.*, 307 F.2d 783, 786, 134 USPQ 529, 532 (5th Cir.1962); *Zysset v. Popeil Bros., Inc.*, 276 F.2d 354, 357–358, 124 USPQ 250, 252 (7th Cir.1960); and *No–Joint Concrete Pipe Co. v. Hanson*, 344 F.2d 13, 144 USPQ 519, 520–521 (9th Cir.1965).

■ 6. Limitations or features disclosed in the Ramos '090 patent specifications can-

not be read into a patent claim to attempt to avoid infringement. *Intervet America, Inc. v. Kee–Vet Labs, Inc.*, 887 F.2d 1050, 12 USPQ2d 1474 (Fed.Cir.1989); *Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 9 USPQ2d 1289 (Fed.Cir.1988) *cert. denied,* 490 U.S. 1068, 109 S.Ct. 2069, 104 L.Ed.2d 634 (1989); *Sjoland v. Musland*, 847 F.2d 1573, 6 USPQ2d 2020 (Fed.Cir.1988); *DMI, Inc. v. Deere & Co.*, 755 F.2d 1570, 225 USPQ 236 (Fed.Cir.1985).

7. Biomet's reliance on the decision in *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 19 USPQ2d 1500 (Fed.Cir.1991) is misplaced. That decision did not and could not *sub silentio* reverse the long-standing law, such as *Sun Studs, Inc. v. ATA Equipment Leasing, Inc.*, 872 F.2d 978, 10 USPQ2d 1338 (Fed.Cir.1989) and *Winans v. Denmead*, 56 U.S. (15 How.) 330, 343, 14 L.Ed. 717 (1853), cited with approval in *Corning Glass Works v. Sumitomo Electric U.S.A., Inc.*, 868 F.2d 1251, 9 USPQ2d 1962 (Fed.Cir.1989). Additionally, in *Unique* the Federal Circuit listed the factual circumstances that:

> If, as Unique argues, linear border pieces of framing material, whose ends are mitered, are the same as linear border pieces and a right angle corner piece, the recitation of both types of pieces is redundant.

939 F.2d at 1562.

Here, the outer bearing section and locking ring are not redundant. The locking ring holds the outer bearing section in the acetabular cup, and the outer bearing section acts as a bearing when holding the ball of the femoral component in the acetabular cup.

Thus, *Unique* was clearly decided on its specific facts, and the standing law as stated in *Winans* and *Sun Studs* was not even mentioned, let alone changed, by the decision in *Unique*. Nor does the *Unique* decision provide any basis for a finding of non-infringement in this case.

8. If a U.S. patentee relies on the doctrine of equivalents to prove infringement, the doctrine of "file wrapper estoppel" or "prosecution history estoppel" may apply. *See Exhibit Supply Co. v. Ace Patents Corp.*, 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736, 52 USPQ 275 (1942). As the Federal Circuit

said in *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1362, 219 USPQ 473, 481 (Fed.Cir.1983):

> The doctrine of prosecution history estoppel precludes a patent owner from obtaining a claim construction that would resurrect subject matter surrendered during prosecution of his patent application. The estoppel applies to claim amendments to overcome rejections based on prior art, *Dwyer v. United States,* 357 F.2d 978, 984 [174 Ct.Cl. 1064], 149 USPQ 133, 138 (Ct. Cl.1966), and to arguments submitted to obtain the patent, *Coleco Industries, Inc. v. ITC,* 573 F.2d 1247, 1257, 197 USPQ 472, 480 (CCPA 1978).

■ A purpose of the estoppel is to ensure that a patentee is not granted by the courts via the doctrine of equivalents patent rights which he could not lawfully have received from the U.S. Patent and Trademark Office. *See e.g., LaBounty Mfg., Inc. v. U.S. International Trade Commission,* 867 F.2d 1572, 9 USPQ2d 1995 (Fed.Cir.1989); *Wilson Sporting Goods Co. v. Geoffrey & Associates,* 904 F.2d 677, 14 USPQ2d 1942 (Fed.Cir. 1990) *cert. denied,* 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990); *Insta–Form Products, Inc. v. Universal Foam Systems, Inc.,* 906 F.2d 698, 704, 15 USPQ2d 1295, 1299 (Fed.Cir.1990); and *We Care, Inc. v. Ultra–Mark Int. Corp.,* 930 F.2d 1567, 18 USPQ2d 1562 (Fed.Cir.1991).

■ 9. The Court has considered the proper construction of Claims 1 and 3 of the Ramos '090 patent in view of the plain language of those claims, the patent specifications and drawings, other claims of the patent and the patent's PTO prosecution history, and finds that subject to the open construction permitted by the introductory word "comprising," each claim as a whole should be given its plain meaning within the context of the patent as a whole.

10. The Court has considered the amendments and arguments in the prosecution history of the Ramos '090 patent and concludes that nothing therein constitutes any prosecution history estoppel which would prevent reading Claims 1 and 3 of the '090 patent on the accused Biomet BiPolar hip prosthesis.

■ 11. The Court holds that Defendant Biomet's manufacture and sale of its Biomet BiPolar hip prosthesis makes Biomet liable for infringement of each of Claims 1 and 3 of the Ramos '090 patent. Those claims may literally be read upon the accused Biomet BiPolar hip prosthesis and unquestionably the accused Biomet BiPolar hip prosthesis is an infringing equivalent of the invention claimed in those claims. *See Sun Studs, Inc. v. ATA Equipment Leasing, Inc.,* 872 F.2d 978, 989, 10 USPQ2d 1338 (Fed.Cir.1989) *reh'g. declined,* 882 F.2d 1583 (Fed.Cir.1989); *McGrath v. Draper Corp.,* 384 F.2d 672, 673, 155 USPQ 609, 610 (1st Cir.1967); *Royal Typewriter Co. v. Remington Rand, Inc.,* 168 F.2d 691, 693, 77 USPQ 517, 519 (2d Cir. 1948); *Industrial Instrument Corp. v. The Foxboro Co.,* 307 F.2d 783, 786, 134 USPQ 529, 532 (5th Cir.1962); *Zysset v. Popeil Bros., Inc.,* 276 F.2d 354, 357–358, 124 USPQ 250, 252 (7th Cir.1960); *No–Joint Concrete Pipe Co. v. Hanson,* 344 F.2d 13, 144 USPQ 519, 520–521 (9th Cir.1965); *Corning Glass Works v. Sumitomo Electric U.S.A., Inc.,* 868 F.2d 1251, 1259, n. 6, 9 USPQ2d 1962 (Fed. Cir.1989); and *Radio Steel & Mfg. Co. v. MTD Products, Inc.,* 731 F.2d 840, 847, 221 USPQ 657, 663 (Fed.Cir.1984) *cert. denied,* 469 U.S. 831, 105 S.Ct. 119, 83 L.Ed.2d 62 (1984).

■ 12. The Court concludes that the evidence demonstrates that Defendant Biomet has willfully infringed the Ramos '090 patent. Having actual knowledge of the '090 patent before commencing its infringing manufacture and sale which were inspired by knowledge of Dr. Ramos' patented invention, Biomet failed to take the required step of obtaining a sound opinion of competent patent counsel as a basis for any good faith belief on non-infringement, and expressly did not submit any such evidence at trial. *Underwater Devices, Inc. v. Morrison–Knudsen Co. Inc.,* 717 F.2d 1380, 1390, 219 USPQ 569, 576–577 (Fed.Cir.1983).

## Patent Validity

■ 13. Under 35 U.S.C. § 282 any issued U.S. patent "shall be presumed valid." The Ramos '090 patent still enjoys that presumption. However, in June 1992, the same

law firm which represents Defendant Biomet in this proceeding, filed in the PTO a request for reexamination by the PTO of Dr. Ramos' patent on behalf of a defendant in another civil action for infringement of Dr. Ramos' '090 patent. Any person may cite to the PTO prior art patents or printed publications and request the PTO to reexamine claims of an issued U.S. patent based on the cited prior art.

14. Any patent claims confirmed by the PTO as a result of the reexamination proceeding enjoy the statutory presumption of validity under 35 U.S.C. § 282. When the patent in suit has been reexamined under 35 U.S.C. §§ 301–307, the presumption of validity remains unchanged. *Kaufman Company, Inc. v. Lantech, Inc.,* 807 F.2d 970, 974, 1 USPQ2d 1202, 1204 (Fed.Cir.1986). *Moreover, the burden of proving the unpatentability of claims in a patent is made heavier when the patent has survived a reissue or reexamination proceeding in the PTO in light of the same prior art presented to the district court. Custom Accessories, Inc. v. Jeffrey–Allen Industries, Inc.,* 807 F.2d 955, 961, 1 USPQ2d 1196, 1200 (Fed.Cir.1986) (emphasis added).

15. Title 35 United States Code does not authorize a non-patent owner requestor to appeal reexamination decisions on patentability. *Syntex (U.S.A.), Inc. v. U.S. Patent and Trademark Office,* 882 F.2d 1570, 1576, 11 USPQ2d 1866, 1871 (Fed.Cir.1989) and *Boeing Co. v. Commissioner of Patents and Trademarks,* 853 F.2d 878, 881, 7 USPQ2d 1487, 1489 (Fed.Cir.1988).

16. The Court concludes that the Ramos U.S. Patent 4,380,090 continues to be entitled to the statutory presumption of validity pursuant to 35 U.S.C. § 282, even after consideration of all the prior art and the other evidence presented by Defendant Biomet upon original PTO examination and reexamination.

17. The Ramos '090 patent enjoys an *enhanced* presumption of validity in that the Patent and Trademark Office has issued its Notice of Intent to Issue Reexamination Certificate, dated April 21, 1993, *wherein it confirms the validity of Claims 1–5 in light of the Request for Reexamination filed by* *Defendant Biomet's counsel on behalf of a defendant in another civil action for infringement of the Ramos '090 patent.* (Plaintiff's Exhibit 100; Gibson Testimony, 4/22/93, pp. 70–71).

18. Although patent claims are presumed valid under 35 U.S.C. § 282, the presumption can be overcome by a showing of clear and convincing evidence of invalidity. Under 35 U.S.C. § 103, invalidity on the basis of obviousness can be shown where the claimed invention would have been obvious to one of ordinary skill in the art at the time the invention was made.

19. Though the ultimate question is one of law, a determination of obviousness, under Section 103 is based upon the factual considerations enumerated in *Graham v. John Deere Co.,* 383 U.S. 1, 13, 86 S.Ct. 684, 691, 15 L.Ed.2d 545, 148 USPQ 459, 465 (1966), namely: (a) the scope and content of the prior art; (b) the differences between the prior art and the claims at issue; (c) the level of ordinary skill in the art; (d) objective evidence of non-obviousness. *Custom Accessories, Inc. v. Jeffrey–Allan Indus., Inc.,* 807 F.2d 955, 1 USPQ2d 1196 (Fed.Cir.1986).

20. The issue of obviousness is determined by reference to the hypothetical person of ordinary skill in the art. *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.,* 796 F.2d 443, 230 USPQ 416 (Fed.Cir. 1986).

21. Defendant Biomet *failed* to demonstrate to this Court by clear and convincing evidence that the claimed invention in the Ramos '090 patent was obvious as alleged under 35 U.S.C. § 103. Defendant Biomet *conclusively* failed to show that the claimed subject matter in the Ramos '090 patent as a whole would have been obvious to one of ordinary skill in the art to which the subject matter pertains at the time it was invented by Dr. Ramos. Indeed, Defendant Biomet did not set forth any arguments or prior art references which had not been fully briefed by its attorneys to the Patent and Trademark Office in the reexamination proceeding of the Ramos '090 patent. The PTO rejected the arguments and prior art references cited by Defendant Biomet's attorneys and de-

clared that claims 1–5 of the Ramos '090 patent are valid and patentable over such arguments and prior art. (Plaintiff's Exhibit 100).

22. The evidence in this record of objective indicia of non-obviousness, including long-felt need for a bipolar hip prosthesis as designed by Dr. Ramos in his claimed invention, the failure of prior attempts to resolve that need, the adoption and use of Dr. Ramos' claimed invention by the industry as fulfilling that need, and the commercial success of the features of Dr. Ramos' claimed invention, demonstrates the non-obviousness and validity of the Claims of the Ramos '090 patent. (Gibson Testimony, 4/22/93, pp. 71–75). *See Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 USPQ 459 (1966).

### Laches

■ 23. Biomet began producing its bipolar hip prosthesis in the fall of 1983. Its first sale of the device also occurred in the fall of 1983.

24. Its bipolar hip prosthesis was first displayed by Biomet in its product catalog in November, 1983. (Defendant's Exhibit 55). The first marketing brochure devoted solely to its bipolar hip prosthesis was disseminated to Biomet sales representatives in January, 1984. (Plaintiff's Exhibit 86).

25. Biomet's BiPolar hip prosthesis was introduced at the American Academy of Orthopaedic Surgeons in Atlanta, Georgia on February 9, 1984. The Academy meeting took place from February 9, 1984 to February 14, 1984. At that time, Biomet set up a booth at which its new products, including its BiPolar hip prosthesis, were displayed. In addition to the actual device, brochures relating to the BiPolar hip prosthesis were available and distributed to attendees of the Academy meeting.

26. Dr. Ramos attended the Academy meeting in Atlanta, Georgia from February 9, 1984 to February 14, 1984. Dr. Ramos visited the Biomet booth on February 9, 1984, and saw a sample of Biomet's BiPolar hip prosthesis and picked up a brochure relating to the device.

27. Beginning shortly after he discovered the Biomet device at the 1984 meeting of the American Academy of Orthopaedic Surgeons, Dr. Ramos attempted to hire attorneys to bring this patent infringement action. He consulted various attorneys in Miami and Philadelphia. Such attorneys reviewed the pertinent documents and took time studying the case. However, these attorneys required approximately $100,000.00 from Dr. Ramos to initiate the case. Dr. Ramos testified that it was excessively expensive to retain such attorneys. (Ramos Testimony, 4/13/93, pp. 76–85).

28. On October 25, 1989, Dr. Ramos' attorney sent a letter to Biomet demanding that it cease and desist manufacturing and selling its BiPolar hip prosthesis. Biomet continued to manufacture and sell its BiPolar hip prosthesis; and on February 9, 1990, Dr. Ramos filed suit against Biomet.

29. Dr. Ramos acted with reasonable diligence in his circumstances to obtain competent legal counsel to represent him in bringing a patent infringement action against Biomet.

■ 30. To invoke the laches defense, a defendant has the burden to prove two factors: (a) the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and (b) the delay operated to the prejudice or injury of the defendant. *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032, 22 USPQ2d 1321 (Fed.Cir.1992).

■ 31. In determining whether the laches defense applies in a patent infringement action, length of delay, seriousness of prejudice, the reasonableness of excuses, and the defendant's conduct or culpability must be weighed to determine whether the patentee dealt unfairly with the alleged infringer by not promptly bringing suit. *A.C. Aukerman Co.*, 960 F.2d at 1034.

■ 32. Because of its origins in equity, the determination of laches is not made upon the application of "mechanical rules." *Id.* at 1031. The length of time which may be deemed unreasonable has no fixed bound-

aries, but rather depends on the circumstances of each case. *Id.* at 1032. The application of the defense of laches is committed to the sound discretion of the district court. *Id.*

33. A presumption of laches may be eliminated by offering evidence to show an excuse for the delay or that the delay was reasonable. *Aukerman,* 960 F.2d at 1038.

34. Additionally, a patentee may be able to preclude application of the laches defense with proof that the accused infringer was itself guilty of misdeeds toward the patentee. *A.C. Aukerman Co.,* 960 F.2d at 1038. A patentee may also defeat a laches defense if the infringer has engaged in particularly egregious conduct which would change the equity significantly in plaintiff's favor. *A.C. Aukerman Co.,* 960 F.2d at 1033.

35. A prospective infringer who has actual knowledge of a U.S. patent has an affirmative duty to avoid infringement thereof. At a minimum the prospective infringer must have considered the patent claims carefully enough vis-a-vis his proposed conduct to have formed a reasonable basis upon which to have a good faith belief that the proposed conduct will not infringe the patent. *Rolls Royce Limited v. GTE Valeron Corp.,* 800 F.2d 1101, 231 USPQ 185 (Fed.Cir.1986).

36. Here, Biomet had actual knowledge of, and a copy of, the Ramos '090 patent, and copies of its prosecution history, all received directly from Dr. Ramos, before Biomet commenced designing, manufacturing or selling its BiPolar device. (*See* Plaintiff's Exhibit 5; Plaintiff's Exhibit 12A; Plaintiff's Exhibit 13; Noblitt Testimony, 4/20/93, pp. 78–79; and Ramos Testimony, 4/13/93, pp. 73–76).

37. Biomet certainly considered the concepts of Dr. Ramos' patented invention after Mr. Noblitt of Biomet met with Dr. Ramos in March, 1983. (Noblitt Testimony, 4/20/93, p. 102).

38. Mr. Noblitt was aware that he would have reviewed the design of the accused Biomet device before sales were commenced, but he had no specific recollection of having done so. (Noblitt Testimony, 4/20/93, pp. 115–116).

39. Biomet at least considered getting legal advice on the Ramos '090 patent before commencing its accused infringing acts. (Plaintiff's Exhibit 12; Plaintiff's Exhibit 13).

40. Biomet did not offer in evidence any evidence that it sought, obtained or relied upon a sound opinion of competent counsel which could indicate that Biomet's BiPolar device would not infringe the Ramos '090 patent. (Statement of Donald E. Knebel, Esq., Biomet's counsel, 4/20/93, p. 80).

41. The Court infers that either Biomet did not even seek such an opinion or that if Biomet did obtain such an opinion, the opinion received was adverse to the positions taken by Biomet in this litigation.

42. In view of Biomet's extensive actual knowledge of the Ramos '090 patent, in having actually met with Dr. Ramos and his attorney, Biomet had a continuing duty to avoid infringement of the Ramos '090 patent.

43. Biomet never sought a license under the Ramos '090 patent.

44. Biomet's failure to obtain a sound opinion of competent counsel, failure to have a reasonable basis upon which to have a good faith belief of non-infringement and failure to seek a license, in all the circumstances of this case, constituted unclean hands which bars Biomet from obtaining the effects of any alleged equitable estoppel defense such as laches. *A.C. Aukerman Co.,* 960 F.2d 1020.

45. Biomet as the accused infringer bears the ultimate burden of persuasion of the affirmative defense of laches. *A.C. Aukerman Co.,* 960 F.2d at 1038.

46. The elements which must be established to bar a patentee's suit by reason of equitable estoppel are the patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee did not intend to enforce its patent against the infringer, the alleged infringer relies on the conduct, and due to his reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim. *A.C. Aukerman Co.,* 960 F.2d

at 1042. Dr. Ramos did not engage in any such misleading conduct here.

■ 47. Silence alone will not create estoppel in a patent infringement action unless there was a clear duty to speak or somehow the patentee's continued silence reinforces the accused infringer's inference from the patentee's known acquiescence that the accused infringer will be unmolested. *A.C. Aukerman Co.*, 960 F.2d at 1043–1044.

■ 48. Dr. Ramos had repeatedly put Biomet on notice of the existence of his '090 patent before Biomet commenced its infringing acts. Biomet had a continuing duty to avoid infringement of Dr. Ramos' patent. Dr. Ramos never committed any affirmative act to indicate to Biomet that he would not enforce his '090 patent against Biomet. On October 26, 1989, Dr. Ramos affirmatively notified Biomet of its infringement. (Plaintiff's Exhibits 12, 12A, 13 and 90; Ramos Testimony, 4/13/93, pp. 71–76 and 85; and Noblitt Testimony, 4/20/93, pp. 76–79).

49. Plaintiff Ramos' excuses for not earlier commencing suit against Biomet are reasonable in his circumstances. The evidence in this case showed that in the late 1980's U.S. patent infringement litigation often cost more than $1,000,000.00 to litigate through trial.

50. Even after Biomet was given notice of infringement by Dr. Ramos' counsel in October, 1989, Biomet took no action to switch its accused device to a different design which would clearly avoid infringement, thus aggravating its own damages through no fault of Dr. Ramos. (*See* Defendant's Exhibit 138 (date of design) and Fleming Testimony, 4/22/93, pp. 22–23).

51. "Preponderance of the evidence" is the appropriate evidentiary standard to establish the facts relating to the laches issue in a patent infringement action. *A.C. Aukerman Co.*, 960 F.2d at 1045.

52. Biomet failed to carry its burden of persuasion of either of the affirmative defenses of laches or equitable estoppel. There is no credible evidence to support a defense of equitable estoppel. The reasonableness of Dr. Ramos' circumstances and reasons for not earlier filing suit, and Biomet's unclean hands in failing to act responsibly in avoiding infringement of Dr. Ramos' patent, prevent this Court from concluding that the alleged laches defense is applicable in this case.

Damages

■ 53. A patentee-plaintiff's damages are provable in accordance with 35 U.S.C. § 284:

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

When the damages are found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.

The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances.

54. Insomuch as the Plaintiff here, Dr. Ramos, is not a manufacturer or seller of the patented device, damages shall be awarded in the form of a reasonable royalty.

55. At the trial of this cause, Plaintiff presented the testimony of an expert witness on patent infringement damages, Mr. Paul M. Enlow, formerly Vice President and Assistant General Counsel, with responsibility for intellectual property matters, for AT & T and its subsidiaries, and former General Patent Counsel for Xerox Corporation. Mr. Enlow testified that Plaintiff Ramos is entitled to a reasonable royalty of 10 per cent of the total volume of sales by Biomet of its entire BiPolar hip prosthesis.

56. Biomet has been a party to a number of license agreements for patent rights and technology relating to human prostheses, including hip prostheses. (Enlow Testimony, 4/20/93, p. 34).

57. Since the fall of 1983, Biomet's net profits before taxes on its sales of the acetabular cup alone of the Biomet BiPolar hip prosthesis have been about 34.86% of the total revenue which Biomet has received for such sales. (Plaintiff's Exhibit 96).

58. Biomet's level of profits on its sales of the Biomet BiPolar hip prosthesis (acetabular cup alone), and the commercial success of such device, support the view that 10% of gross sales receipts is a reasonable royalty for Biomet to have paid Dr. Ramos for its unauthorized use of his patented invention. *See Georgia–Pacific Corp. v. U.S. Plywood–Champion Papers, Inc.*, 446 F.2d 295 (2d Cir.1971).

59. Mr. Enlow testified that Plaintiff Ramos is entitled to a reasonable royalty of 10 per cent of the total sales relating to the entire prosthesis including the femoral component sold for use with the Biomet BiPolar hip prosthesis. He based his opinion on the "entire market rule" in the damages area of patent law. (Enlow Testimony, 4/20/93, pp. 24–26). Claims 1 and 3 of the Ramos '090 patent cover the entire hip prosthesis, including the femoral component and head/ball. The "entire market rule" provides that the royalty base will include whatever was sold that included the invention. *State Industries, Inc. v. Mor–Flo Industries, Inc.*, 883 F.2d 1573, 1580, 12 USPQ2d 1026 (Fed.Cir. 1989) *cert. denied*, 493 U.S. 1022, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990); *Georgia–Pacific Corp. v. U.S. Plywood Champion Papers, Inc.*, 446 F.2d 295 (2d Cir.1971). Accordingly, the sales of the femoral components of the Biomet BiPolar hip prosthesis should be included in the royalty base.

60. Since the fall of 1983, Defendant Biomet has manufactured and sold in the United States, without authority of Dr. Ramos, approximately 47,600 units of at least the acetabular cup portion of the accused Biomet BiPolar hip prosthesis, and has received approximately $17,700,000.00 in gross revenues for such sales. (Plaintiff's Exhibit 96; Enlow Testimony, 4/20/93, p. 28). However, the evidence demonstrates that the accused Biomet BiPolar hip prosthesis includes and is often sold including a femoral stem-ball. Claims 1 and 3 of the Ramos '090 patent include the femoral component in the patented combination. (Enlow Testimony, 4/20/93, p. 30; Gibson Testimony, 4/16/93, pp. 16–17; Swanger Testimony, 4/19/93, pp. 51–53).

61. A reasonable royalty of 10% paid by Biomet to Dr. Ramos on Biomet's gross sales receipts of approximately $17,699,635.11 (for the acetabular cup alone) for the period to date yields compensatory damages in the amount of $1,769,963.51.[1]

62. As part of his compensatory damages, Dr. Ramos is entitled to pre-judgment interest on the total reasonable royalties due to him. *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983).

63. Mr. Enlow testified that a reasonable prejudgment interest rate in this case is ten per cent. Mr. Enlow based his opinion regarding the prejudgment interest rate upon certain investments made by Dr. Ramos over the relevant time period between 1984 and 1992, and found that Dr. Ramos' investments yielded an average of ten per cent return. Defendant Biomet did not contest this rate.

64. Plaintiff has requested *compounded* pre-judgment interest, but after considering all the facts and matters before it, the Court has not allowed it.

65. Accordingly, pre-judgment interest is calculated as follows:

$2,000.00 per unit, yields a total sales amount between $71,400,000.00 and $95,200,000.00. The Court declines to compute damages on this basis due to the scarcity of reliable evidence as to the actual sales price of a complete Biomet BiPolar hip prosthesis during the relevant time period and the lack of evidence as to how many of the

---

1. Plaintiff also presented an alternative computation of damages based on an average purchase price between $1,500.00 and $2,000.00 for a complete hip prosthesis, including the femoral stem, as testified to by Mr. Pritchard, a Biomet witness. Biomet's sales of 47,600 units of its BiPolar hip prosthesis, including the femoral stem, if sold at prices between $1,500.00 to

| Year | Period | × | Royalty due[2] | × | Int Rate | = | Total |
|------|--------|---|------|---|------|---|------|
| 1983–84 | 1.25 yrs. | × | $ 8,019.90 | × | 10% | = | $ 1,002.48 |
| 1985 | 1 year | × | 42,452.11 | × | 10% | = | 4,245.21 |
| 1986 | 1 year | × | 78,315.96 | × | 10% | = | 7,831.60 |
| 1987 | 1 year | × | 118,991.47 | × | 10% | = | 11,899.15 |
| 1988 | 1 year | × | 152,483.82 | × | 10% | = | 15,248.38 |
| 1989 | 1 year | × | 221,003.28 | × | 10% | = | 22,100.33 |
| 1990 | 1 year | × | 307,433.87 | × | 10% | = | 30,743.39 |
| 1991 | 1 year | × | 353,869.20 | × | 10% | = | 35,386.92 |
| 1992 | 1 year | × | 367,380.50 | × | 10% | = | 36,738.05 |
| 1993 | .25 yr. | × | 120,013.40 | × | 10% | = | 3,000.34 |
| | | | | | TOTAL | | $168,195.85 |

66. Therefore, Biomet owes Dr. Ramos damages of a reasonable royalty amount of $1,769,963.51 plus prejudgment interest of $168,195.85, for a total of $1,938,159.36 as compensatory damages.

67. Plaintiff Ramos is also entitled to an enhanced damages award because of Defendant Biomet's willful infringement. 35 U.S.C. § 284; see, e.g., Underwater Devices, Inc. v. Morrison–Knudsen Co., Inc., 717 F.2d 1380, 1390, 219 USPQ 569, 576–577 (Fed.Cir. 1983). Here, it is uncontroverted that Biomet had actual knowledge of Dr. Ramos' patent before it commenced its infringing manufacture and sale. Niles Noblitt, Chairman of Defendant Biomet's Board of Directors, had not only met with Dr. Ramos and his attorney, but had been provided with, and inspected, Dr. Ramos' drawings, patent application and a prototype prosthesis from another manufacturer (which is a defendant in another patent infringement action by Dr. Ramos). Mr. Noblitt had also been provided with a copy of the actual Ramos patent upon issuance to Dr. Ramos, months before Defendant Biomet ever had a completed set of drawings from which to begin manufacturing its BiPolar hip prosthesis.

68. Biomet had an affirmative duty to avoid infringement. It chose to proceed with its infringing activities instead, without any sound basis for a good faith belief of non-infringement. Biomet did not present any evidence of having obtained, and did not rely upon, any opinion of patent counsel indicating non-infringement of the Ramos patent. Thus, Biomet is guilty of willful infringement of Dr. Ramos' '090 patent, and is entitled to an increased damages award under 35 U.S.C. § 284.

69. Biomet, through counsel, admits that it is not relying on any infringement opinions in this case.

70. Biomet commenced the manufacture and sale of its infringing BiPolar hip prosthesis with full knowledge of the existence of Dr. Ramos' '090 patent. (Plaintiff's Exhibit 12A, 13 and 14; Ramos Testimony, 4/13/93, pp. 69–77; Noblitt Testimony, 4/20/93, pp. 77–85).

71. In view of this Court's findings of fact herein above, this Court holds that Biomet is a willful infringer of the Ramos '090 patent. In the Court's discretion, Dr. Ramos is entitled to be paid three times the amount of his $1,938,159.36 in compensatory damages. Therefore, the award for Defendant Biomet's willful infringement results in an additional award of $3,876,318.72 for a total of $5,814,478.08.

72. Accordingly, pursuant to the aforegoing, Plaintiff, Dr. Pedro Ramos, shall be awarded judgment against Defendant, Biomet, Inc. in the amount of: (a) $1,938,159.36 (compensatory damages, of which $1,769,963.51 is a reasonable royalty and $168,-

47,600 units sold were sold as complete units, including the femoral stem.

2. The reasonable royalty due was calculated by multiplying the ten per cent royalty rate by the amount of sales for the relevant period. (See Enlow Testimony, 4/20/93, pp. 40–41).

195.85 is prejudgment interest), plus (b) $3,876,318.72 (enhanced damages for willful infringement), for the sum of (c) *$5,814,-478.08* (total damages).

73. Presently, Biomet's total annual sales are approximately $300,000,000.00; total annual sales of the acetabular cups are approximately $3,673,805.00; and Biomet's net profit before taxes is approximately 34.86% of gross sales. Accordingly, the total damages and royalty rate herein are reasonable. (*See* Plaintiff's Exhibit 96; Enlow Testimony, 4/20/93, pp. 29–33; and Noblitt Testimony, 4/20/93, p. 89).

74. In light of the foregoing, judgment shall be entered in favor of the Plaintiff, Dr. Ramos. The Plaintiff shall within ten days submit a proposed form of judgment prepared in accordance with these findings and conclusions. Plaintiff shall also be paid its costs by Defendant Biomet upon filing of a Bill of Costs. The amount of the costs awarded will be determined by the Clerk of Court.

DONE AND ORDERED.