**RAMP RESEARCH AND DEVELOPMENT, INC., and Elite Aluminum Corporation, Plaintiffs/Counterdefendants,**

v.

**STRUCTURAL PANELS, INC., a/k/a Structall Building Systems, Inc., Defendant/Counterplaintiff.**

No. 94–6156–CIV.

United States District Court, S.D. Florida.

April 10, 1997.

Thomas F. Munro, Foley & Lardner, West Palm Beach, FL, John J. Feldhaus, Foley & Lardner, Washington, DC, for Plaintiff/Counterdefendant Ramp Research and Development, Inc.

Robert Edward Pershes, Ft. Lauderdale, FL, for Plaintiff/Counterdefendant Elite Aluminum Corp.

Richard Michael Saccocio, Ft. Lauderdale, FL, Lee Anne LeBlanc, Hollywood, FL, for Defendant/Counterplaintiff.

### FINAL JUDGMENT

FERGUSON, District Judge.

This case is about a persistent effort on the part of the plaintiffs to circumvent a protected monopoly, which efforts have not been discouraged by prior administrative and judicial determinations. This judgment, hopefully, is another step toward giving the inventor final relief from the costly nine-year litigation.

Ramp Research and Development, Inc., ("Ramp") commenced this action against Structural Panels, Inc., ("Structural") and Elite Aluminum Corp., ("Elite"), seeking a declaratory judgment that patents held by Structural are invalid and not infringed by an aluminum panel manufactured and sold by Elite as Ramp's licensee.[1] Additionally, Ramp alleges that Claim 6 of Structural's U.S. Patent Number 5,086,599 ('599) is invalid because (1) it was anticipated by prior art, and (2) Structural failed to cite relevant references to the patent examiner. Structural counterclaimed for patent infringement and for injunctive relief. Specifically, Structural claims that the Ramp panel infringes Claim 1 of Structural's U.S. Patent Number 4,769,963 ('963) and Claim 1 of the improvement patent '599.

### The Parties and the Products

Ramp makes snap-together panels with a polystyrene core and aluminum outer skin which is used for walls and patio roofs in the building industry. Elite is Ramp's exclusive licensee in Florida for the manufacture and sale of the Ramp panels. Elite is also licensed by Structural to manufacture and sell similar aluminum panels. Structural is the owner of the original and reexamination patents at issue. Its owner, Steve Meyerson, is the inventor of the '963 and '599 patented devices.

The original '963 patent describes a building panel having a snap together joint that fastens adjacent panels, without external means, and having an insulating foam core and aluminum outer skirts. The panels snap together as a function of the joint design at the end of the outer metal skirts. The interconnecting relationship of the aluminum sheets causes the foam core of the receptive panels to form an edge-to-edge insulating fit.

---

1. By order of the Court entered before the trial commenced, the parties were realigned to make Elite a co-plaintiff and counterdefendant along with Ramp in accordance with its actual posture in the case.

A reexamination certificate was issued for the '963 patent which added four additional independent claims and twenty-five additional dependent claims.

Structural's '599 patent improves on the innovative joint of the '963 patent by providing a sealant pocket and a press which accommodates the internal caulking. It also includes a stabilizer portion which keeps the panels laterally aligned. In all other respects the '599 patent is similar to the '963 patent.

The accused device is Ramp's building panel manufactured and sold under U.S. Patent Number 5,138,812. It is an insulated panel with a snap together joint and a foam core which abuts that of the adjacent panels forming an insulating fit. Ramp's building panel also has a sealant pocket which accommodates the sealant, a sealant press and a stabilizing component which provides lateral stability.

### Background Facts

Steve Meyerson, founder and president of Structural, undertook in 1987 to make condensation and leak proof aluminum panels for use in patio roofs. He built prototypes which featured a snapping interlock without metal protrusions, designed with grooves to eliminate the need for extraneous adhesives. Mike Palmerston, Meyerson's co-worker, and investor in the business, was familiar with the product design. Palmerston accompanied Meyerson to the office of the patent attorney who prepared the application for what was to become the disputed '963 patent. That patent issued on September 13, 1988.

Elite began an immediate "knockout" of the product, prompting an infringement lawsuit.[2] Structural prevailed in the lawsuit.

In 1989, Palmerston, who had left employment with Structural, set up his own corporation, "Flips" to sell non-competing aluminum panels for refrigeration units. Beginning in 1992, Palmerston made and sold roof and wall aluminum panels in competition with Structural under the name of Ramp Research, Inc. Elite, the co-plaintiff which had been unsuccessful in its 1988 litigation against Structural, became the exclusive licensee for the manufacture and sale of Palmerston's aluminum panels. Notably, in the 1988 litigation with Elite, Palmerston testified for Structural against Elite's challenge to the validity of Meyerson's '963 patent.

After leaving Structural in 1989 on unfavorable terms, Palmerston applied for and obtained a patent on an aluminum snap-lock panel similar to Meyerson's patented product. In the application he omitted reference to Meyerson's '963 patent.

This second effort to misappropriate Structural's patented invention was both collusive and coercive. Elite, a major competitor and loser in the earlier litigation, provided the manufacturing and marketing capability for the infringing product. Structural's exclusive supplier of foam used as insulation in the aluminum panel was Imperial Foam. The president and owner of Imperial Foam was Robert Ahrens who was president of Ramp and 51% owner of the company. Meyerson was unaware that his foam supplier was the majority owner of Ramp. Allegedly, the name Ramp is taken from the initials of the owners—Robert Ahren and Mike Palmerston, owner of the remaining 49%. Ahrens and his sales representative, Chris Bache, were frequent visitors to Structural's plant and knew how Structural's panels were constructed.[3]

A confidential licensing agreement between Ramp and Elite contemplated that Structural would again sue for infringement. As a settlement plan in the event of this lawsuit, the Ramp/Elite agreement proposed a cross-licensing agreement with financially-strapped Structural. The settlement offer made no provision for additional damages in light of the litigation or additional damages that might flow from a finding of willful infringement.

### Testimony of Expert Witnesses

David Pettis, a patent attorney, testified that he was engaged by Ramp for a limited

---

**2.** *Structural Panels, Inc. v. Elite Aluminum, Inc.,* Case No. 88–6965, 16 U.S.P.Q.2d 1474 (S.D.Fla. 1989)

**3.** When questioned about the ethical propriety of secretly competing with its customer on a product line which he knew might infringe, Ahrens replied that he saw no conflict of interest.

opinion solely on whether the accused device manufactured under Palmerston's '812 patent literally infringed on Meyerson's '963 patent. For that purpose he was sent only a copy of both patents, a certificate of reexamination and a photocopy of a panel cross-section. He said he did not believe he was sent a search report or evidence of prior litigation. Neither did he know that Palmerston had previously testified in support of the validity of the '963 patent. Particularly, he was not asked to do a validity opinion, and was not sent a file history which would have been necessary to a complete opinion under the Doctrine of Equivalents.[4]

William Thomson, an engineer and attorney called by Ramp, admitted to little experience with wall panels and in testifying as an expert. Although he had an opinion that the Ramp product did not infringe on the Structural patent, he candidly expressed trouble understanding the first element of the claim. Mr. Thomson's testimony focused on infringement. On the validity question he acknowledged that the examiner had accepted the applicant's distinguishing arguments over prior art, admitted that he had made no independent search to determine what was out there before Meyerson's contribution, and finally agreed that Meyerson had made a 'contribution' to the art. His demonstrations on the functioning of prototype and marketed panels were helpful to the court.

On the question of literal infringement the witness, Thomson, outlined each element of the '963 and '599 patents identifying areas where, in his opinion, the claims did not read on the accused device.

Structural called Robert Schwartz, a registered patent attorney, as its expert. His testimony covered essentially three areas. Using diagrams, and parts of the aluminum panels for demonstrations in support of his opinions, he testified that there was literal infringement and infringement under the Doctrine of Equivalents as to claim 1 of both the '963 and '599 patents. Second, he opined, Ramp is estopped to challenge the validity of Structural's patents as the invalidity-by-prior art contention made here was previously rejected by a trial and appellate court, and by the Patent and Trademark Office in a post-trial application for reexamination.

Lastly, Mr. Schwartz testified that the infringement by Ramp and Elite is willful because an opinion of noninfringement by an attorney which does not include examination of file wrapper history and prior art is not a good faith opinion which would negate a finding of willfulness.

According to Steve Meyerson, and undisputed, is that Structural is the only source for the patented aluminum building panels and that the company has four licensees selling its product for royalty fees. Licensing agreements were entered into with Elite and Texas Aluminum pursuant to settlement negotiations after infringement lawsuits were brought. Ramp, he said, is the only company still infringing on his patent.

Under the Structural/Elite licensing agreement, Elite pays Structural a 3% royalty based on gross profits. The Ramp/Elite licensing agreement for the manufacture and sale of the infringing products incorporates the same terms.

### Findings of Fact on Validity and Infringement

#### A. Validity

Nothing presented at trial differs from what had been considered by the patent examiner when the patent issued, at a previous trial where the validity of the '963 patent was challenged, or during the reexamination. Specifically, the British patent relied upon by Ramp and Elite as relevant prior art, U.K. Patent Application GB 2,168,732(U.K.'732), was distinguished in the reexamination. Two of the several distinguishing features

---

4. Ron Smith, Ramp's attorney, gave an opinion that the Ramp panel did not infringe on the Structural panel. It is not clear in the record what he relied on for his opinion. Smith hired Pettis to give a second opinion on infringement. Again it is not clear whether the decision to limit the information given to Pettis and the scope of his review was made by Smith or Palmerston.

Palmerston blamed Pettis for the dearth of information used as a foundation for the opinion. However, Palmerston admitted that there was an obligation to disclose all prior art that might be relevant to Pettis' examination, and that a number of things that should have been included in the references provided for the '812 patent application were not.

found by the examiner is that the U.K. '732 did not "snap" lock; and the Ramp product, unlike the British product, has a vise-like grip on the two adjacent panels for centering. Having reviewed relevant parts of the file history, the Court agrees, as previously determined, that there is a clear difference between the U.K.'732 patent and U.S. patent '963.

Another allegation made by the plaintiffs in the complaint for a declaratory judgment of invalidity is that the manual distributed to installers of the Structural panel should have been filed with the patent office as prior art pursuant to 35 U.S.C. 102(b). The manual gave instructions for placing an oversupply of caulking (sealant) in groves of the interlock zones and allowing the excess to extrude when the panels are joined.

Elite says its panel is different in that it specifies the amount of sealant to be used. However, nothing in the '599 patent makes a claim for the method of caulking. Indeed, the opinion of Ramp's expert that claim 6 "probably" was not valid over the modified '963 even though sealant was central to the inquiry in the '599 patent examination, is too lacking in certainty to have probative value. Further, having reviewed the subject installation manual, the court finds that all of the elements and limitations of the claim are not found within the single reference.

It is also significant to the alleged invalidity on the ground of anticipation by prior publication, that the primary examiner for the '963 patent, James Ridgill, Jr., also examined the '599 patent.

### B. Infringement

■ Witnesses for Ramp and Elite gave an element by element examination of the claims in the '963 and '599 patents, identifying certain elements which in their opinion did not read onto the accused device.

### The '963 Patent

Claim 1 is reproduced below. Each claim element which the plaintiffs claim are missing from the Ramp/Elite panel design is shown in bold print at the first occurrence of the element.

1. In a rigid building panel with substantially parallel planar front and rear metal sheets separated by an insulating rigid foam core bonded to the sheets and having a first pair of opposite parallel and substantially straight end edges, the improvements comprising

a second pair of opposite longitudinal edges having complimentary **first and second interlocking elements,** forming the longitudinal edge of each metal sheet

the first interlocking element forming a **U-shaped projection** along matching edges of the front and rear metal sheets **with a first core edge between the first interlocking elements having an inwardly projecting dish-shaped geometric configuration,**

the second interlocking element forming a ramp and a groove behind the ramp along matching edges of the front and rear metal sheets **with a second core edge between the second interlocking elements having an outwardly projecting geometric shape conforming to the dish-shaped geometric configuration of the first core edge,**

the first interlocking U-shaped projections on the second pair of edges of the metal sheets capable of sliding over the ramp of the second interlocking elements and **snapping in place in the groove behind the ramp forming a tight interlock** fit and forming an edge to edge insulating fit between the first and second core edges.

The court finds that each element of claim 1 of the '963 patent is found in the Ramp/Elite device either literally or under the Doctrine of Equivalents. The Ramp/Elite panel has (1) substantially parallel planar front and rear metal sheets which are separated by an insulating rigid foam core, (2) a first pair of opposite longitudinal edges, (3) complimentary first and second interlocking elements forming the longitudinal edge of each metal sheet, and (4) first interlocking elements on the panel which form a U-shaped projection along matching edges of the front and rear metal sheets.

The U-shaped projection of the '963 patent is infringed by way of the Doctrine of Equivalents. The first interlocking element on the Ramp/Elite panel is a curvilinear projection which performs substantially the same function in substantially the same way to obtain the same result as the U-shaped projection described in claim 1 of the '963 patent in that the longitudinal edge of the Ramp/Elite panel extends beyond an edge of the styrofoam core to form an interlock element capable of snapping in place in the groove behind the ramp in the interlocking element of the adjacent panel resulting in a fit sufficiently close so as to perform the intended function of insulation.

The edge between the first interlocking elements of the Ramp/Elite building panel is an inwardly projecting dish-shaped geometric configuration.

In claim 1 of the '963 patent Structural claims a similar inwardly projecting dish-shaped geometric configuration in its interlocking elements which is infringed under the Doctrine of Equivalents. The area on the Ramp/Elite panel defined by the styrofoam core and the inwardly curving extending interlocking elements perform substantially the same function in substantially the same way to obtain the same result as the inwardly projecting geometric configuration in Structural's interlocking elements.

In the '963 patent, one parallel straight end of the building panel has a styrofoam core and longitudinal interlocking elements which are capable of forming a fit with the outwardly projecting geometric configuration of the interlocking member resulting in a sufficiently close fit of the styrofoam insulating layers to perform the intended function of insulation.

The second interlocking element of the Ramp/Elite building panel forms a ramp and a groove behind the ramp along matching edges of the front and rear metal sheets.

Under the Doctrine of Equivalents, the ramp and groove behind the ramp of the '963 patent are infringed. The Ramp/Elite panel has longitudinal metal edges which extend beyond an edge of styrofoam core to form interlock elements such that the U-shaped

projections of the adjacent panel are capable of sliding over said member resulting in a fit sufficiently close so as to perform the intended function of insulation.

The edge between the second interlocking elements of the Ramp/Elite building panel has an outwardly projecting geometric shape.

Just as claimed in the '963 patent, the first interlocking U-shaped projection on the second pair of edges of the metal sheets on the Ramp/Elite panel are capable of sliding over the ramp of the second interlocking elements and snapping in place in the groove behind the ramp forming a tight interlock fit and forming an edge to edge insulating fit between the first and second core edges.

### The '599 Patent

Claim 1 is reproduced below. Each claim element the plaintiffs allege to be missing from the Ramp/Elite panel design is shown in bold print at the first occurrence of the element.

1. A building panel comprising, in combination,

a core portion having insulating and structural properties,

a skin secured to the core portion having formed **lateral edges which extend beyond the core on one lateral edge of the panel,**

**a nose formed in the core** material portion of one lateral edge of the panel,

and **a nose mating member** formed on the opposite lateral edges of said panel,

a sealant pockets formed on the skin edges provided on the lateral portions of the nose edge and mating member terminating in **a nose core engaging ramp for receiving an opposed yieldable member,**

and opposed means formed with skin which extends from the core and formed defining a sealant locking press provided adjacent the pockets which is formed to define a press for entering into the opposed pocket and terminating with **a further folded centering stabilizer portion which is proportioned to ride on the opposed nose engaging ramp,**

**said locking press being proportioned for a nesting fit within the sealant pock-**

et but providing sufficient clearance to permit sealant material to extrude between the opposed faces of the sealant press and the sealant pocket as the sealant press yieldably moves into the sealant pocket to lockingly engage the two opposed members and their respective adjacent panels.

Each of the elements of claim 1 of the '599 patent are found in the Ramp/Elite panel, either literally or under the Doctrine of Equivalents.

The Ramp/Elite panel has (1) a core portion which has insulating and structural properties, (2) a skin secured to the core portion having formed lateral edges which extend beyond the core on one lateral edge of the panel, (3) a nose formed in the core material portion of one lateral edge of the panel.

Under the Doctrine of Equivalents there is infringement of the '599 patent. The area of the Ramp/Elite panel defined by the protrusion of said core material is such that the lateral edges of the cladding sheets can interlock with those on the adjacent panel to perform the intended function of insulation.

The Ramp/Elite building panel has a nose mating member formed on the opposite lateral edges of the panel.

Under the Doctrine of Equivalents the '599 patent is infringed. The area on the Ramp/Elite panel defined by the geometrical configuration which will be joined with the nose is such that the lateral edges of the cladding sheets can interlock with those on the adjacent panel as to perform the intended function of insulation.[5]

The Ramp/Elite panel has sealant pockets formed on the skin edges provided on the lateral portions of the nose edge and mating member terminating in a nose core engaging ramp for receiving an opposed yieldable member.

Just as claimed in the '599 patent, the Ramp/Elite building panel has a sealant locking press provided adjacent to the pocket which is formed to define a press for enter-

ing into the opposed pocket and terminating with a further folded centering stabilizer portion which is proportioned to ride on the opposed nose engaging ramp.

The locking press on the Ramp/Elite panel is proportioned for a nesting fit within the sealant pocket but providing sufficient clearance to permit sealant material to extrude between the opposed faces of the sealant press and sealant as the sealant press yieldably moves into the sealant pocket to lockingly engage the two opposed member and their respective adjacent panels.

### Controlling Legal Principles

#### A. Validity

■ "A patent shall be presumed valid." 35 U.S.C. § 282. *Roper Corp. v. Litton Sys., Inc.*, 757 F.2d 1266, 225 U.S.P.Q. 345 (Fed. Cir.1985); *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1 U.S.P.Q.2d 1081 (Fed.Cir.1986); *Datascope Corp. v. SMEC, Inc.*, 776 F.2d 320, 227 U.S.P.Q. 838 (Fed.Cir.1985). One who challenges a patent must establish invalidity by clear and convincing evidence. *Carella v. Starlight Archery & Pro Line Co.*, 804 F.2d 135, 231 U.S.P.Q. 644 (Fed.Cir.1986); *Bausch & Lomb, Inc. v. Barnes–Hind Hydrocurve, Inc.*, 796 F.2d 443, 230 U.S.P.Q. 416 (Fed.Cir. 1986). The prior decision of a court on validity serves to inform the district court that caution must be taken in reaching a contrary legal conclusion. *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1569, 28 U.S.P.Q.2d 1081 (Fed.Cir.1993), *cert. denied*, 511 U.S. 1031, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994).

■ The Court should give deference to the expertise of the Patent Office where the PTO twice found the invention patentable initially and upon reexamination. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359, 220 U.S.P.Q. 763 (Fed. Cir.1984) *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). *Transmatic, Inc. v. Gulton Inds., Inc.*, 818 F.Supp. 1052, 27 U.S.P.Q.2d 1561 (E.D.Mich.1993). The burden of proving invalidity is made heavier

---

5. The protruding of the foam core in the '963 and '599 patents, compared to the flat surface foam core in the accused device, is not a substan-

tial dissimilarity, and has nothing to do with the functioning of the engaging ramp.

when the patent has survived a reissue or reexamination in the PTO over the same prior art. *Ramos v. Biomet, Inc.*, 828 F.Supp. 1570 (S.D.Fla.1993).

■ Invalidity for anticipation requires that all of the elements and limitations of the claim are found within a single prior art reference. *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565 (Fed.Cir.1991).

■ Where the patentee's preferred embodiment as disclosed in the patent indicates a less sturdy construction than that used in the patentee's commercial embodiment, and where those skilled in the art would have been aware of the sturdier construction, the omission was trivial. *Sure Safe Indus., Inc. v. C & R Pier Mfg.*, 832 F.Supp. 293, 296 (S.D.Cal.1993).

## B. Infringement

■ A party may be guilty of infringing a patent even without any intent to do so. *Hilton Davis Chemical Co. v. Warner–Jenkinson Co., Inc.*, 62 F.3d 1512, 35 U.S.P.Q.2d 1641 (Fed.Cir.1995). A party may also infringe even though in good faith it believes that what it is doing is not an infringement of any patent. *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 478, 94 S.Ct. 1879, 1884–85, 40 L.Ed.2d 315 (1974). Determining whether a patent is infringed involves a two-step inquiry: (1) interpreting the claims, followed by (2) comparing the properly interpreted claims to the accused device. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 821 (Fed.Cir.1992). One is liable for patent infringement if a single claim is infringed. *Panduit Corp. v. Dennison Mfg. Co., Inc.*, 836 F.2d 1329, 5 U.S.P.Q.2d 1266 (Fed.Cir.1987).

■ Literal infringement may be found if the accused device falls within the scope of the asserted claims as properly interpreted. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753 (Fed.Cir.1984). If the accused structure or method does not literally infringe the claim, infringement may still be established under the "Doctrine of Equivalents." *Graver Tank & Mfg. Co., Inc. v. Linde Air Prod. Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, 85 U.S.P.Q. 328 (1950).

Application of the doctrine of equivalents rests on the substantiality of the differences between the claimed and accused products or processes, assessed according to an objective standard. *Hilton Davis Chem. Co. v. Warner–Jenkinson Co., Inc.*, 62 F.3d 1512, 35 U.S.P.Q.2d 1641 (Fed.Cir.1995).

■ The Doctrine of Equivalents is founded on the theory that if the patented device and the accused product do the same work in substantially the same way, and accomplish the same result, they are the same, even though they differ in name, form or shape. *Id.* Consideration must be given to the purposes for which an element or a step is used in a patent claim, the qualities it has when combined with the other elements, and the function which it is intended to perform. *Bio–Rad Laboratories, Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 222 U.S.P.Q. 654 (Fed.Cir.1984);

■ The Doctrine of Equivalents is applicable to thwart piracy, misappropriation or "stealing" of a patented invention through the use of unsubstantial changes. *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 20 U.S.P.Q.2d 1456 (Fed.Cir.1991).

■ Contributory infringement occurs where a defendant actively and knowingly aids and abets direct infringement by another party. *Hewlett–Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 15 U.S.P.Q.2d 1525 (Fed.Cir.1990). The defendant need not directly infringe itself but must have intended to cause the acts which it knew or should have known constitute direct infringement. *Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544, 16 U.S.P.Q.2d 1587 (Fed.Cir.1990); *C.R. Bard, Inc. v. Advanced Cardiovascular Systems, Inc.*, 911 F.2d 670, 15 U.S.P.Q.2d 1540 (Fed.Cir.1990).

■ Evidence of prior litigation is admissible. *Wang Laboratories, Inc. v. Mitsubishi Elec. Am., Inc.*, 29 U.S.P.Q.2d 1481 (C.D.Cal. 1993). *See also* Fed.R.Evid. § 408.

■ Where a determination of the scope of patent claims was made in a prior case, and the determination was essential to the judgment there on the issue of infringement, there is collateral estoppel in a later case on

the scope of such claims. *Pfaff v. Wells Electronics., Inc.*, 5 F.3d 514, 28 U.S.P.Q.2d 1119 (Fed.Cir.1993) (citation omitted); *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 5 U.S.P.Q.2d 1255 (Fed. Cir.1987).

### C. Willful Infringement

Where a potential infringer has actual notice of another's patent rights, it has an affirmative duty of due care, and that affirmative duty includes obtaining competent legal advice before infringing or continuing to infringe. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 23 U.S.P.Q.2d 1426 (Fed.Cir. 1992). If the opinion of counsel is not competent, willful infringement may be found. An opinion letter that is merely conclusory, containing insufficient analysis, or lacking foundation is incompetent. *Id.; Minnesota Min. & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 24 U.S.P.Q.2d 1321 (Fed.Cir.1992); *Westvaco Corp. v. International Paper Co.*, 991 F.2d 735, 26 U.S.P.Q.2d 1353 (Fed.Cir.1993).

### D. Damages

A patent owner may recover damages for unauthorized use of its invention under Section 284 of the Patent Act, 35 U.S.C. § 284, measured by either lost profits or a reasonable royalty. A reasonable royalty is the amount that a person desiring to manufacture, use or sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make or sell the patented article in the market at a reasonable profit. *Trans–World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568, 224 U.S.P.Q. 259, 269 (Fed.Cir.1984).

A post litigation reasonable royalty should be higher than a negotiated reasonable royalty because otherwise "the infringer would have nothing to lose, and everything to gain if he could count on paying only the normal, routine royalty non-infringers might have paid." *Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.*, 575 F.2d 1152, 1158 (6th Cir.1978).

Attorney fees may be awarded to the prevailing party in exceptional cases. 35 U.S.C. § 285. An exceptional case is determined by whether the infringement is willful. *Power Lift, Inc. v. Lang Tools, Inc.*, 774 F.2d 478, 227 U.S.P.Q. 435 (Fed.Cir.1985); *S.C. Johnson & Son v. Carter–Wallace, Inc.*, 781 F.2d 198, 228 U.S.P.Q. 367 (Fed.Cir.1986). Treble damages may be awarded where the infringement is found to be willful even in the absence of an award of attorney's fees. *Id.*

### E. Injunction

After infringement has been established, it is contrary to the laws of property, of which patent law partakes, to deny the patentee's right to exclude others from use of his property. 35 U.S.C. § 261. It is the general rule that an injunction will issue when infringement has been adjudged, absent a sound reason for denying it. *Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1247 (Fed.Cir.1989), *cert. denied*, 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989). An injunction may be denied after a finding of infringement where the infringer would suffer irreparable hardship without any concomitant benefits to the patentee. *Foster v. American Machine & Foundry Co.*, 492 F.2d 1317, 1324 (2d Cir.1974), *cert. denied*, 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (1974).

### *Conclusion*

The plaintiffs have failed to show by clear and convincing evidence that the defendants' patents '963 and '599 are invalid based on prior art or by anticipation of prior art. Principles of preclusion bar another validity challenge based on references considered and rejected in prior judicial proceedings. Prior publication in the form of the Installation Manual presented in this case does not invalidate either patent because all of the elements and limitations of the claims are not found within the single prior art reference.

On a proper interpretation of the claims and an application of the claims to the accused device, there is literal infringement or infringement under the Doctrine of Equivalents as to each element of Claim 1 in both the '963 and the '599 patent. The differences highlighted by the counterdefendants are not substantial.

Elite is liable for contributory infringement. Elite's argument that this dispute arises under the licensing agreement which provides for arbitration, and that the claim against it should be dismissed for lack of subject matter jurisdiction, fails to persuade. By counterclaim, Structural seeks, essentially, to void a separate interference agreement between Elite and Ramp, which agreement diverts to Ramp, royalties belonging to Structural.

On the evidence presented at trial the only basis for determining damages is reasonable royalties. Although royalties should be higher than royalties negotiated prior to litigation the Court determines that the administration of a higher royalty, under the totality of the circumstances, where Structural and Elite already have a negotiated licensing agreement for manufacture and sale of the same products, would be difficult. Ramp and Elite shall release to Structural all royalties claimed by Ramp which are still being held by Elite.

This case is exceptional in the sense that the infringement was willful and warrants a trebling of damages. Further, Structural should be awarded reasonable attorneys' fees and costs as a prevailing party.

Although Structural seeks a permanent injunction, on the evidence presented the Court finds that, as between Structural and Elite, a compulsory license would be more equitable. The reason being, again, that as between the parties there is already an exclusive licensing agreement to manufacture and sell the same products in the future and the award of treble damages and attorney fees gives Structural all the benefits deemed appropriate on the facts. Royalties shall be awarded to Structural on the same terms as the existing contract commencing from the first date of sales of the infringing products by Ramp or Elite.

A permanent injunction is appropriate as to Ramp.

It is therefore,

**ORDERED** and **ADJUDGED** that the complaint for declaratory judgment is **DISMISSED** and the plaintiffs shall take nothing in this action. Judgment is entered for the defendant/counterplaintiff on the counterclaim for willful infringement of the '963 and '599 patents.

Jurisdiction is reserved to fix damages in accordance with the above conclusions and to make an award of reasonable fees and costs.

The counterdefendant, Ramp, is permanently enjoined from manufacturing, selling, or licensing the accused device or any substantially similar infringing device, and from contributing to infringing activities of any other person or entities with respect to the accused device or substantially similar devices.